# EXHIBIT 1

**SUMMONS**

Attorney(s) Janice G. Dubler

Office Address  457 Haddonfield Road, Suite 600

Town, State, Zip Code Cherry Hill, NJ 08002


Telephone Number  (856) 488-7723

Attorney(s) for Plaintiff Dorado Systems, LLC

Dorado Systems, LLC


     Plaintiff(s)

   Vs.

ABILITY Netowrk Inc., Kenneth Ernsting, Mark Briggs,

Jack Hauser,Budd Meadows, John Doe1-10, ABC Corp1-10
     Defendant(s)

## Superior Court of New Jersey

   CAMDEN     COUNTY

   Chancery     DIVISION

Docket No: C-39-14

## CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

    The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

    If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

    If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

                                       Clerk of the Superior Court

DATED:  05/23/2014

Name of Defendant to Be Served: ABILITY Network, Inc.

Address of Defendant to Be Served:  100 North 6th Street, Suite 900A, Minneapolis, MN 55403

**MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP**
(A Limited Liability Partnership Formed in Pennsylvania)
BY: LOUIS R. MOFFA, JR.
JANICE G. DUBLER
LibertyView, Suite 600
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 488-7700
ATTORNEYS FOR PLAINTIFF, DORADO SYSTEMS, LLC

RECEIVED

2014 MAY 20   PM 4: 21

SUPERIOR COURT/LAW DIV.

| | |
|---|---|
| DORADO SYSTEMS, LLC, | : SUPERIOR COURT OF NEW JERSEY |
| | : CHANCERY DIVISION |
| Plaintiff, | : CAMDEN COUNTY |
| | : |
| | : DOCKET NO. |
| v. | : |
| | : Civil Action |
| | : |
| ABILITY NETWORK INC., KENNETH | : **VERIFIED COMPLAINT** |
| ERNSTING, MARK BRIGGS, JACK | : |
| HAUSER, BUDD MEADOWS, JOHN | : |
| DOE 1-10, and ABC CORPS. 1-10 | : |
| Defendants. | : |

Plaintiff, Dorado Systems, LLC ("Dorado"), by and through its attorneys, for its Verified

Complaint against Defendants, ABILITY Network Inc. ("ABILITY"), Kenneth Ernsting

("Ernsting"), Mark Briggs ("Briggs"), Jack Hauser ("Hauser"), Budd Meadows ("Meadows"),

John Does 1-10 and ABC Corps. 1-10 (collectively "Defendants"), says:


I.     **THE PARTIES**

1.      Plaintiff Dorado is a New Jersey Limited Liability Company with its

principal place of business located at 30 Washington Avenue, Haddonfield, New Jersey.

2.      Defendant ABILITY is a Corporation located at Butler Square, 100 North

6th Street, Suite 900A Minneapolis, MN 55403.

3.      Defendant Ken Ernsting is an individual residing in Sparta, New Jersey.  He is ABILITY'S Executive Vice President and Chief Operating Officer, responsible for ABILITY's corporate development within the organization, including the negotiation of technology/partner agreements, leading acquisition and integration activities, management of government relations and business development engagement.

4.      Defendant Mark Briggs is ABILITY's Chief Executive Officer, responsible for developing the overall strategic direction of ABILITY.

5.      Defendant Jack Hauser is ABILITY's Chief Financial Officer.

6.      Defendant Bud Meadows is ABILITY's Executive Vice President and Chief Revenue Officer.

## II.    THE FACTS

### A.    Dorado Systems and its Insurance Validator Portal

7.      Dorado is a technology company that develops products in the healthcare industry, primarily relating to the process by which the healthcare providers and healthcare payers, such as Medicare, Medicaid, Blue Cross, and Aetna, communicate with each other. One of the products Dorado offers is  a web based portal called Insurance Validator that allows healthcare providers to connect to insurance carriers, Medicare, and other payers instantaneously. ("Insurance Validator" or "Portal").

8.      Dorado's Insurance Validator technology enables healthcare providers to access and retrieve insurance data such as eligibility, benefits, and co-pays using one step and by only providing very specific patient information.

9.       Dorado's Insurance Validator technology permits healthcare providers to request information from multiple payers at one time.  Clients can also create search specific queries to obtain only the information they need the most.

10.      The user of Dorado's Insurance Validator Portal can enter information in a uniform way no matter what the relevant payer's formatting requirements are on the back end.

11.      Dorado's Insurance Validator Portal includes a highly advanced reporting tool that has normalized all data and is also user-friendly. Dorado has developed specialized, unique reporting views, in conjunction with its provider client base, that simply and clearly alert end users to issues with the eligibility returns. Viewers will find the same information in the same area of each report, regardless of patient or payer.

12.      Dorado has developed an additional function with its Insurance Validator Portal called, "Dashboard Alerts." These Alerts were developed by Dorado and its pilot clients over several years. These Dashboard Alerts allow users to easily set up alerts that will track any specific data they choose. These alerts can instantly notify users of any changes in a patient's insurance eligibility, co-pays, deductibles, and many other possible data issues across multiple payers. Users can quickly sort information to assure there are no errors in patient data, therefore assuring each billing cycle runs smoothly.

13.      Dorado Systems' advanced reporting process displays patient data in a clean and user-friendly format. All data is streamlined and organized in the same manner for each report, which allows for simplified viewing.

14.      Dorado offers a transaction data storage where clients can electronically

-3-

manage and store all of their patient census and eligibility data in one safe place. This allows client to retrieve information in the possible case of future billing audits or rejections.

15.     Dorado began developing its Insurance Validator Portal, Dashboard Alerts, and advanced reporting processes back in 2010. It has spent over $2,000,000 and 10,000 hours developing its technology. This technology, its related processes, displays and functionality are proprietary to Dorado and highly confidential.

### B.     Dorado / ABILITY Agreements

16.     ABILITY is the largest supplier in the United States of eligibility transactions, claims, and connectivity to Medicare. Essentially, ABILITY's services permit its clients in the healthcare industry to connect to Medicare to determine patient coverage and eligibility, among other items.

17.     On or around May 1, 2013, Ability acquired IVANS which was the second largest Medicare services corporation with over 50,000 clients.

18.     Upon information and belief, ABILITY previously  licensed a product from TransUnion, formerly MedData, that offered a basic "all-payer" solution. This solution was a single validation portal that offered little to none of the same functionality of Dorado's Insurance Validator Portal.

19.     ABILITY had not been able to develop or access an all-payer product with the functionality of Dorado's Insurance Validator.

20.     ABILITY wanted to be able to offer Dorado's Insurance Validator

-4-

technology to its clients.

### Mutual Non-Disclosure Agreement

21.        Dorado is very careful with its technology, particularly the technology

behind its Insurance Validator product.

22.        It required confidentiality before it shared non-public details about its

software with ABILITY.

23.        On January 10, 2012, Dorado and ABILITY entered into a Mutual Non-

Disclosure Agreement. A true and correct copy of the Mutual Non-Disclosure Agreement is

attached hereto as Exhibit A.

24.        The Mutual Non-Disclosure Agreement was intended to protect the parties'

confidential information from being misused by the other party.

25.        The Mutual Non-Disclosure Agreement defined "Confidential Information"

to include:

> "all information … relating to or used in the Discloser's business
> including, but not limited to, all data, reports, specifications, … computer
> source and object code and related technical information and
> documentation, … information about marketing and sales, products or
> pricing, customers or potential customers, vendors or potential vendors,
> information systems and other technology used into the Discloser's
> business …" (Ex. A ¶1)

26.        The Mutual Non-Disclosure Agreement prohibited the recipient of

confidential information from using or disclosing the other party's confidential information. (Ex.

A ¶2-3)

27.        Defendant Hauser signed the Mutual Non-Disclosure Agreement and agreed

-5-

to its terms on behalf of ABILITY.

28.      Dorado then began to share some of the details concerning the Insurance Validator technology with ABILITY, in reliance on the Mutual Non-Disclosure Agreement.

29.      Dorado used best efforts to keep information private from non-essential ABILITY employees and only worked with senior management and on a need-to-know basis.

**Master Services Agreement**

30.      ABILITY was impressed with the technology it saw and wanted to offer an "all payer" solution like Dorado's Insurance Validator product to its extensive client network.

31.      ABILITY entered into a Master Services Agreement with Dorado, pursuant to which ABILITY could, among other things, sell Original Equipment Manufacturer ("OEM") licenses of Dorado's Insurance Validator Portal to its extensive healthcare client network. A true and correct copy of the Master Services Agreement without exhibits is attached hereto as Exhibit B.

32.      The Master Services Agreement is dated June 4, 2012 and has a three year term. (Exh. B)

33.      The Master Services Agreement provides, among other things, "the right for ABILITY to make available to ABILITY's customers the intellectual property comprising Dorado Systems' [Insurance Validator] portal (the "Portal") pursuant to the provisions hereof ("the Services")..." (Ex. B)

34.      Under the Master Services Agreement, ABILITY could make the Insurance

-6-

Validator Portal available by selling its clients OEM licenses to Dorado's Portal. (Ex. B)

35.         The Master Services Agreement provided a structure for ABILITY to pay

for each OEM license it sold to its clients to use Dorado's Insurance Validator Portal. (Ex. B)

36.         The Master Services Agreement included very specific protections for

Dorado's Intellectual Property and Confidentiality requirements.

37.         Paragraph 4.1 of the Master Services Agreement provided:

> ABILITY acknowledges and agrees that all intellectual property rights … in and
> to the Services are solely and exclusively the property of Dorado Systems. Under
> no circumstances shall ABILITY or any of ABILITY's clients have any
> ownership interest in any of the intellectual property of Dorado Systems,
> including, but not limited to, the Services and its software.

38.         Paragraph 4.2 of the Master Services Agreement provided:

> **ABILITY shall not, and shall ensure that ABILITY's clients do not,
> seek access to the source code, logic or operation of the Service, or
> otherwise attempt to reverse engineer any portion of the Services.
> Neither ABILITY nor ABILITY's clients shall make or attempt to
> make any copies of the Services.** The breach or threatened breach by
> ABILITY and/or ABILITY's clients of any provision of any portion of
> this Section 4 of this Agreement may, at Dorado Systems' option, subject
> ABILITY to the immediate termination of all rights hereunder and Dorado
> Systems shall be entitled to an injunction restraining any such breach
> without limiting Dorado Systems' other remedies, including the recovery
> of any damages. (Emphasis added)

39.         Paragraph 4.3 of the Master Services Agreement provided:

> ABILITY and Dorado Systems shall treat as confidential all proprietary or
> confidential information and materials of the other party (or its licensors,
> providers or clients). This shall be referred to as "Confidential
> Information". **Neither party shall use the Confidential Information of
> the other party, except in performance of its obligations hereunder or**

**in exercising its rights as specifically set forth in this Agreement.** Each party shall not disclose the Confidential Information of the other party (or its licensors, providers or clients) to any third party (except as set forth in Section 4.4) and shall take commercially reasonable efforts to prevent unauthorized disclosure or access to the Confidential Information of the other party. (Emphasis added)

40.     The Master Services Agreement further provided that, before ABILITY could make the Service available to one of its clients, ABILITY would have to obtain the client's written agreement to the limitations on the client's use of the Services consistent with the limitations set forth in the Master Services Agreement. (Ex. B at ¶2.3)

41.     Defendant Hauser signed the Master Services Agreement and amendments and agreed to their terms on behalf of ABILITY.

C.     **ABILITY Complete**

42.     Ability wanted to sell the Dorado Insurance Validator under ABILITY's own label using the brand name "Ability Complete."

43.     Pursuant to the Master Services Agreement, and as part of the OEM process, Dorado branded its Insurance Validator Portal so that when ABILITY clients logged into the Dorado Insurance Validator Portal, they would see labeling for "ABILITY Complete."

44.     ABILITY Complete was Dorado's Insurance Validator Portal, created by Dorado, licensed for use by ABILITY. It ran on Dorado's servers and used Dorado's technology.

45.     "ABILITY Complete" is a branding label put on Dorado's Insurance Validator portal so ABILITY's clients could use Dorado's Insurance Validator Portal and see

-8-

ABILITY's name.

46.     This can be seen comparing a screen shot from Dorado's Insurance Validator Portal with the Dorado label, a copy of which is attached as Exhibit C, with a screen shot from the Dorado product with the ABILITY label, a copy of which is attached as Exhibit D.

47.     ABILITY, with its sales force of over 50 salespersons, aggressively marketed the OEM licenses for Dorado's product under the name Ability Complete. Because of all of the features of the Dorado Portal, ABILITY was very successful at selling OEM licenses to Dorado's Portal.

**D.     ABILITY Surreptitiously Steals Aspects of Dorado's Technology**

48.     Over their relationship, ABILITY approached Dorado and offered to purchase Dorado. That was unsuccessful.

49.     ABILITY attempted to buy Dorado's Insurance Validator technology and code. Dorado rejected this offer as well.

50.     On information and belief, having been unsuccessful at obtaining the technology through legitimate means, defendants ABILITY, Hauser, Briggs, Meadows and Ernsting determined to surreptitiously copy it to avoid paying Dorado OEM license fees and to increase its own profit margin.

51.     ABILITY obtained access to Dorado's confidential technology and know-how because of its confidential relationship with Dorado.

52.     ABILITY accessed some of this confidential information without Dorado's

-9-

knowledge or permission. For example

      a.     ABILITY gained access to the data elements behind Dorado's reports, and its raw data, as well as confidential and proprietary aspects of the Insurance Validator through a troubleshooting session with a Dorado developer and John Larscheid of Ability Support and development. Dorado used a "back door" key to access this confidential information through a private URL key.

      b.     Upon information and belief, ABILITY subsequently used this "back door" and started accessing confidential portions of the Insurance Validator without Dorado's permission or knowledge. This allowed ABILITY to learn how Dorado software was structured, and gave Ability access to, among other items, the variables and data structure used by Dorado to allow its system to interact with a variety of private insurers, many of which used different formats and criteria in their electronic communications.

      c.     ABILITY gained an understanding about Dorado's "middleware logic" through questions related to sales and how best to market the OEM Complete licenses.

      d.     ABILITY obtained knowledge and functionality of the "middleware logic" to gain an understanding of what is returned by the payer and then converted and mapped by Dorado for end user reporting.

53.     ABILITY also obtained other knowledge and information about Dorado's Insurance Validator that it only had access to because of the contractual promises that it had made and its confidential relationship with Dorado.

54.     ABILITY's support team opened thousands of support tickets that gave

them the knowledge of Dorado work flow.

55.     ABILITY's support team had daily interactions with Dorado's support team, working through behind the scenes technical solutions and issues relating to the technology.

56.     ABILITY engaged Dorado to perform work based on a Statement of Work ("SOW"), which helped ABILITY obtain a knowledge of work flow and systems architecture.

57.     Defendants represented to Dorado that they had clear intentions of continuing to develop a strong and long term business relation between ABILITY and Dorado.

58.     ABILITY continued to require additional support and discussed additional future enhancements up and into the fourth quarter of 2013.

59.     Dorado, based on these conversations with ABILITY, added additional employees for development and support of the licensing agreement with ABILITY.

60.     ABILITY allowed and supported this concept of a long-term relationship knowing that ABILITY was secretly planning to launch its own knockoff product.

61.     To help demonstrate the copycat nature of the product that ABILITY is offering, the marketing materials for the Dorado Insurance Validator Portal licensed to ABILITY, which Dorado created and licensed to ABILITY, are shown on the attached Exhibit E, and the marketing materials for ABILITY's copycat portal, which it surreptitiously began designing and launched in late 2013 or early 2014, are attached as Exhibit F.

62.     The Dorado OEM product and the ABILITY copycat product are both called "Complete."

-11-

63.     ABILITY has been marketing the copycat version as an "upgrade" or new version of the Dorado Portal. Both products offer the same functionality and features in the same way and use much of the same terminology.

64.     Both products use Dorado's terminology, such as "My Dashboard" and "Raw 271" and maintain the same filters designed by Dorado and licensed to ABILITY.

65.     Other features copied are the work flow, alerts and triggers, banners, design and reporting.

66.     The similarities are too numerous to list, but, for example, both products:

        a.     permit users to create custom favorite My Dashboard settings.

        b.     have available action to "remove from Dashboard," "mark as reviewed," and "mark as unreviewed."

        c.     have the "change status for a request that appears on the dashboard."

        d.     let clients add notes to enter customized messages that can be viewed by other users.

        e.     have the same steps to make an eligibility request.

        f.     offer the feature to add multiple payers to your payer selection.

        g.     permit users to check a box to designate that the user needs to view A7 STC information.

-12-

        h.     use Service Type Code change by carrier to support various payer 271 return rules.

        i.     use the term "Raw X12 File" and permit users to view Raw 271 and X12. Raw 271 was coined by Dorado and is not an industry accepted term.

        j.     permit the user to save the contents of the Eligibility Reponses Page by Selecting this from the top of the eligibility response.

        k.     offer filters for Therapy Caps and Service Types.

        l.     offer the same filters on Medicare Reponses.

        m.     permit users to save favorite filters and to click on filter history to search eligibility requests.

        n.     display in red when patient information returned by a payer is a mismatch of data from what the user submits along with other colored warning reports.

        o.     offer the same status alerts.

        p.     permit multiple status alerts for each status alert type if multiples are detected on the response.

        q.     have an eligibility summary section that displays effective dates for Medicare and give a date of death if applicable.

        r.     provide a benefit summary that summarizes eligibility benefits not associated with any service types.  Both group the summary by insurance type and coverage

-13-

level if the payers sends this information back on the 271.

        s.     offer a "configure payers" page.

67.     ABILITY is using the same workflow and terminology to describe the knock-off Complete as the existing Dorado OEM licensed Insurance Validator Portal uses.

68.     A comparison of the marketing materials show that ABILITY even used the same picture of the same woman, just reversed it. (Exhs. E and F)

69.     ABILITY is even referring to the stolen product as an "*upgrade*" of the product offered by Dorado.

70.     Attached as Exhibit G is a screen shot from ABILITY's website. ABILITY calls the product an "upgrade."

71.     ABILITY used its access to Dorado's confidential information and trade secrets to develop, manufacture and sell its own substantially similar portal, to the substantial detriment of Dorado.

**E.    <u>Refusal to Pay, Deception and Concealment</u>**

72.     From March 2013 through October 2013, ABILITY's sales of Dorado's Insurance Validator Portal under the label ABILITY Complete increased each month over the prior month.

73.     In December 2013, sales precipitously dropped.

74.     ABILITY has not sold any new licenses at all since December 2013.

75.     Additionally, from December 2013 to the present, ABILITY has deactivated hundreds of licenses from Dorado's system and continues to deactivate licenses on a daily basis.

76.     Dorado inquired to Ernsting and others at ABILITY during this time period if there were any issues. But ABILITY, including defendants Hauser, Ernsting, Briggs and Meadows, concealed that ABILITY was launching a product.

77.     For example, upon questioning by Dorado, Meadows and Ernsting denied having a product with the functionalities of Dorado's Insurance Validator that would replace Dorado's product and instead said it was merely offering its own existing product, which did not have the functionalities the Dorado product, at a lower price.

78.     Meadows and Ernsting denied any intention to remove clients from the Dorado system, claiming that its system was barebones and lacked bells and whistles.

79.     During one call in January 2014, Defendant Meadows explicitly represented that ABILITY fully intended to continue selling Dorado's Insurance Validator Portal and that the low numbers were based on December only.

80.     Dorado bills ABILITY for renewals of its licenses at the beginning of each month. ABILITY paid the invoices for renewals in January and February 2014, but in March 2014, when 175 licenses came up for renewal, ABILITY only partially paid Dorado and claimed that over 80 licenses did not renew.

81.     On April 1, 2014, Dorado wrote to ABILITY for a "status update on the February invoice payment." Rather than reveal a dispute or reveal that ABILITY had a new product and did not intend to renew or to pay for renewals, defendant Ernsting wrote back, "Paul

-15-

Steiner and I have been buried for several weeks and got a late start on reconciling NPIs. We are sending ACH tomorrow."

82.     On April 3, 2014, Dorado wrote to ABILITY defendant Ernsting stating that "it appears that only the transactions were paid on the invoice. Not sure what the issue is, but give if you could me a call and explain, I would appreciate it."

83.     Defendant Ernsting wrote back to Dorado, but instead of revealing that ABILITY had its own product and did not want to renew with Dorado's product, Defendant Ernsting wrote, "we have been extraordinarily busy the last several weeks. Paul Steiner is in the process of working to reconcile the NPI number…"

84.     Ultimately ABILITY refused to pay for many of the renewals, claiming they were not being renewed.

85.     Most of the accounts that ABILITY claimed had been deactivated and were not being renewed were used in April, after the renewal date passed. ABILITY should have deactivated the licenses in February if the clients did not intend to renew. On a call in April with Meadows and Ernsting, Ernsting refused to pay for the deactivated licenses but instead offered Dorado a prorated payment for the use in March of the Dorado Portal.

86.     Upon information and belief, ABILITY left these licenses on the system and continued to use them past their renewal period to prevent Dorado from detecting that it had a new system.

87.     Upon information and belief, ABILITY moved these clients to its knockoff version telling them it was an "upgrade" and/or a "new version."

-16-

88.       In April 2014, Dorado received communications requesting that client passwords be reset.  Dorado learned that ABILITY had emailed clients stating they are being moved to the *new version* of Complete also called Complete.

89.       On April 30, 2014, defendant Ernsting wrote to Dorado advising that it would not pay that month's $88,000 invoice for 110 OEM license renewals, explaining "*none of the customers are renewing.*"

90.       The Master Services Agreement provides for prevailing party attorneys' fees.

III.   **THE CLAIMS**

## COUNT I - BREACH OF CONTRACT

91.       Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

92.       Defendant ABILITY breached the Master Services Agreement and amendments thereto by, among other things, copying, misusing and misappropriating Dorado's confidential and proprietary information.

93.       Defendant ABILITY engaged in reverse engineering in violation of the Master Services Agreement.

94.       As a direct and proximate result of these breaches, Plaintiff Dorado has been damaged in an amount to be determined at trial.

## COUNT II - BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

95.      Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

96.      ABILITY got customers onto the Portal by obtaining access to Dorado's confidential product and selling Dorado's product to clients.

97.      ABILITY then copied much of Dorado's product in violation of its contractual, common law and statutory obligations and shifted the customers over to its copycat, mis-informing customers that it was an "upgrade" or "new version."

98.      ABILITY did not pay for any of the OEM license renewals for the Portal and instead moved the clients over to the ABILITY copycat system.

99.      ABILITY did this in the middle of a three year contract with Dorado.

100.      In the middle of the three year contract, ABILITY copied the design of the Portal, began manufacturing and marketing a directly competitive product; failed to disclose its decision to copy Dorado's Portal; pressured Dorado to develop coding and create system enhancements, additional resources and functionality and to perform development work to conform to ABILITY's specifications so that ABILITY could take those functions and improvements and include them in its own copycat product and gain access to Dorado's technology; and concealed its creation of the copycat product – all while re-assuring Dorado in an attempt to cover its duplicity.

101.      At all relevant times, Defendant ABILITY has owed Dorado a duty to act in good faith and deal fairly with plaintiff Dorado with respect to any and all matters relating to

or pertaining to the agreements between ABILITY and Dorado.

102.     By its acts, omissions, failures and conduct, Defendant ABILITY breached its duty to act in good faith and deal fairly with respect to Dorado.

103.     As a direct and proximate result of these breaches, Plaintiff Dorado has been damaged in an amount to be determined at trial.

104.     Defendants have engaged in the wrongful conduct described above maliciously, oppressively and with the intent to injure Dorado.

## COUNT III - INTENTIONAL MISREPRESENTATION/ FRAUD

105.     Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

106.     Defendants knowingly and intentionally misrepresented relevant facts to Plaintiff Dorado including, without limitation, their intent to abide by the confidentiality, no copying and no reverse engineering elements of the Master Services Agreement; their plan to copy, manufacture and sell Dorado's product as their own; failing to disclose their decision to copy Dorado's Portal; pressuring Dorado to develop coding and create system enhancements, additional resources and functionality, and development work to conform to ABILITY's specifications at great expense to Dorado so that ABILITY could take those functions and improvements and include them in its own copycat product and access Dorado's technology; and concealing their creation of a copycat product.

107.     Plaintiff Dorado reasonably relied upon these misrepresentations to its detriment by, among other things, giving ABILITY access to its confidential and proprietary

information, hiring employees and devoting resources to ABILITY's requests.

108.     Defendants intended for Plaintiff Dorado to rely on their statements and concealments.

109.     Plaintiff Dorado suffered damages as a direct and proximate result of this reliance, in an amount to be determined at trial.

## COUNT IV - NEGLIGENT MISREPRESENTATION

110.     Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as if fully rewritten herein.

111.     Defendants misrepresented relevant facts to Plaintiff Dorado including, without limitation, their intent to abide by the confidentiality, no copying and no reverse engineering elements of the Master Services Agreement; their plan to copy, manufacture and sell Dorado's product as their own; failing to disclose their decision to copy Dorado's Portal; pressuring Dorado to develop coding and create system enhancements, additional resources and functionality, and development work to conform to ABILITY's specifications at great expense to Dorado so that ABILITY could take those functions and improvements and include them in its own copycat product and access Dorado's technology; and concealing their creation of a copycat product.

112.     Plaintiff Dorado reasonably relied upon these misrepresentations to its detriment by, among other things, giving ABILITY access to its confidential and proprietary information, hiring employees and devoting resources to ABILITY's requests.

113.     As a direct and proximate result of their reliance, Plaintiff Dorado was damaged in an amount to be determined at trial.

## COUNT V – MISAPPROPRIATION OF TRADE SECRETS, CONFIDENTIAL AND PROPRIETARY INFORMATION, AND CONVERSION IN VIOLATION OF COMMON LAW

114.     Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as if fully rewritten herein.

115.     Defendants had access to Dorado's confidential and proprietary information and trade secrets by virtue of ABILITY's confidential relationship with Dorado.

116.     ABILITY agreed, among other things, to keep Dorado's information confidential, not to copy it, and not to reverse engineer it.

117.     Defendants improperly accessed confidential and proprietary aspects of the Dorado systems Insurance Validator without authorization.  Defendants improperly misappropriated confidential trade secrets of Dorado.

118.     ABILITY has used and continues to use this confidential, proprietary and/or trade secret information to its benefit and to the detriment of Dorado.

119.     The misappropriation of trade secrets has proximately caused substantial damage to Plaintiff including, but not limited to, loss of profits and loss of good will, in an amount to be determined at trial.

120.     The misappropriation was malicious, willful and wanton and was done with intent to cause injury to Plaintiff Dorado and its business, thereby entitling Plaintiff Dorado to

-21-

punitive damages in an amount to be determined at trial.

## COUNT VI – UNFAIR COMPETITION

121.     Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as if fully rewritten herein.

122.     ABILITY did not pay for any of the OEM license renewals for the Portal for April and after and instead moved the clients over to the ABILITY copycat system, mis-informing clients that it was an "upgrade" or "new version."

123.     ABILITY got these customers onto the Portal by selling Dorado's product. ABILITY then copied much of Dorado's product in violation of its contractual, common law and statutory obligations and moved the customers over to its copycat system

124.     Defendant ABILITY, by and through its employees and agents, knowingly misrepresented facts or failed to state facts that they had an affirmative obligation to state including, without limitation, their plan to copy, manufacture and sell Dorado's product as their; failing to disclose their decision to copy Dorado's Portal; pressuring Dorado to develop coding and created system enhancements, additional resources and functionality, and development work to conform to ABILITY's specification at great expense to Dorado so that ABILITY could take those functions and improvements and include them in its own copycat product; and concealing its creation of a copycat product.

125.     ABILITY was in a confidential business relationship with Dorado. ABILITY abused that relationship by taking Dorado's proprietary technology and know-how and creating a competing product.

126.     Plaintiff Dorado suffered damages as a direct and proximate result of this reliance, in an amount to be determined at trial.

## COUNT VII - TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS

127.     Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as if fully rewritten herein.

128.     Defendant ABILITY knew that Plaintiff Dorado had its Insurance Validator portal available to sell.

129.     ABILITY launched its own competing product, which it obtained unfairly.

130.     ABILITY mis-marketed its competing product as an "upgrade" or new version.

131.     ABILITY unfairly took away opportunities from Dorado to sell/license its product without unfair competition.

132.     ABILITY did not renew any of the OEM licenses for the Portal this month and instead moved the customers over to the ABILITY "upgrade," which ABILITY developed using Dorado's confidential information.

133.     Plaintiff has suffered damages as a direct and proximate result of ABILITY's conduct, in an amount to be determined at trial.

## COUNT VIII - MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF NEW JERSEY'S TRADE SECRETS ACT

134.     Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as

if fully rewritten herein.

135.     Defendant ABILITY improperly misappropriated and misused confidential trade secrets of Dorado in violation of New Jersey's Trade Secrets Act.

136.     ABILITY has used and continues to use this confidential trade secret information to its benefit and to the detriment of Dorado.

137.     The technology in the Insurance Validator includes, among other items, business data, methods, techniques and processes that have been developed over the course of years and at great expense to Dorado.

138.     The Insurance Validator derives independent economic value from not being generally known to others and not being readily ascertainable by proper means. Dorado takes precautions to maintain the secrecy and confidentiality of this technology.

139.     The misappropriation of trade secrets has proximately caused substantial damage to Plaintiff including, but not limited to, loss of profits and loss of good will, in an amount to be determined at trial.

140.     The misappropriation was malicious, willful and wanton and was done with intent to cause injury to Plaintiff Dorado and its business, thereby entitling Plaintiff Dorado to punitive damages in an amount to be determined at trial.

## COUNT IX - MISAPPROPRIATION OF A NOVEL IDEA

141.     Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as if fully rewritten herein.

142.     Dorado's Insurance Validator Portal and its work flow, alerts and triggers, banners, design and reporting was a novel idea.

143.     The disclosure of confidential, proprietary and trade secret information about this product was made in confidence.

144.     Defendant ABILITY adopted and made use the of information for its own purposes.

## COUNT X UNJUST ENRICHMENT

145.     Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as if fully rewritten herein.

146.     ABILITY has been unjustly enriched by gaining access to confidential information, misusing it, and creating a competing product that it did not develop using fair business practices.

## COUNT XI AMOUNT DUE UNDER CONTRACT

147.     Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as if fully rewritten herein.

148.     In August 2013, the parties amended the Master Service Agreement to provide changes in pricing.  Amendment No. 2 to Master Services Agreement provides, among other things, that "All anniversary sales (renewals) of license will be paid within the same month as the anniversary date."

149.     ABILITY sold licenses that were in effect.  The anniversary date passed and

the licenses renewed.  The licenses were used after the renewal date.  ABILITY has refused to

pay the amounts due under the licenses pursuant to the terms of the Agreement.

150.      ABILITY owes Dorado monies and continues to accumulate amounts due

under the contract.

## COUNT XII INJUNCTION

151.      Plaintiff Dorado incorporates by reference all of the foregoing paragraphs as

if fully rewritten herein.

152.      By reason of the foregoing, Dorado entitled to an injunction against

Defendants prohibiting them and all those acting in concert with them from disclosing or using

Dorado's confidential and proprietary information and trade secrets and prohibiting them from

operating ABILITY Complete or any similar portal.

**WHEREFORE,** Plaintiffs request judgment against Defendants, as follows:

a.      Preliminarily and permanently enjoining Defendants ABILITY, Hauser, Briggs,

Meadows and Ernsting from disclosing or using Dorado's confidential and proprietary

information and its trade secrets;

b.      Preliminarily and permanently enjoining ABILITY from operating the ABILITY

Complete or any similar portal;

c.      Imposing a constructive trust in favor of Plaintiff, consisting of all revenues and

profits derived and to be derived from the misappropriation of Plaintiffs' confidential and

proprietary information and trade secrets, as alleged above, together with interest at the

maximum legal rate; and

b.      For such other and further relief to be determined at trial, including but not

limited to all compensatory and punitive damages to which Plaintiff is entitled, including all

costs of suit and reasonable attorney's fees incurred by Plaintiffs to the extent provided by

contract or law.


                                        Montgomery McCracken Walker & Rhoads, LLP
                                        (A Pennsylvania Limited Liability Partnership)
                                        Attorneys for Plaintiff


                        BY:    _____
                               LOUIS R. MOFFA, JR.
                               JANICE G. DUBLER

Dated:


## NOTICE OF DESIGNATION OF TRIAL COUNSEL PURSUANT TO RULE 4:25-4

        Pursuant to Rule 4:25-4, Louis R. Moffa, Jr., Esquire of Montgomery McCracken Walker

& Rhoads, LLP, is hereby designated trial counsel for Plaintiff.

                                        Montgomery McCracken Walker & Rhoads, LLP
                                        (A Pennsylvania Limited Liability Partnership)
                                        Attorneys for Plaintiff


                        BY:    _____
                               LOUIS R. MOFFA, JR.
                               JANICE G. DUBLER

Dated: May 20, 2014

## CERTIFICATION PURSUANT TO RULE 4:5-1(b)(2)

I hereby certify as follows:

1.      To the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and no other action or arbitration proceeding is contemplated at this time by Plaintiff.

2.      I know of no other parties who should be joined in this action at this time.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

> Montgomery McCracken Walker & Rhoads, LLP
> (A Pennsylvania Limited Liability Partnership)
> Attorneys for Plaintiff
>
> BY:    _____
> LOUIS R. MOFFA, JR.
> JANICE G. DUBLER

Dated: May 20, 2014

## VERIFICATION STATEMENT

          I certify that the fact contained in the foregoing Verified Complaint are true

to the best of my current knowledge, information and belief.  I am aware that if any of the

foregoing statements made by me are willfully false, I am subject to punishment

 

Dated: 5/20/14

                                     EDWARD KENNEDY
                                     TITLE:

-29-

# EXHIBIT A

*Ability*

**MUTUAL NON-DISCLOSURE AGREEMENT**

THIS AGREEMENT is made as of the 10th day of _____ 2011, by and between ABILITY Network Inc. ("ABILITY") and Dorado Systems LLC ("Company").

In consideration of the mutual promises exchanged herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the following terms and conditions shall apply when one of the parties (the "Discloser") discloses "Confidential Information" to the other (the "Recipient") in connection with or during the course of their business negotiations and dealings:

1. **DEFINITION OF "CONFIDENTIAL INFORMATION".** As used in this Agreement, the term "Confidential Information" means all information, in writing marked or legended as confidential or proprietary and if orally disclosed identified as confidential or proprietary at the time of disclosure and confirmed as such in writing within thirty (30) days after disclosure, relating to or used in the Discloser's business, including, but not limited to, all data, reports, specifications, formulae, proposals, studies, business plans and analyses, computer source and object code and related technical information and documentation, financial information and projections, personnel information, information about marketing and sales, products or pricing, customers or potential customers, vendors or potential vendors, information systems and other technology used in the Discloser's business, third-party software, and any information supplied to the Discloser by a third-party in confidence. The foregoing notwithstanding, the term "Confidential Information" does not include and neither party shall have any obligation of confidentiality with respect to information that

   a) was publicly available at the time it was disclosed to the Recipient or which, through no act or omission of the Recipient, becomes publicly available before the Recipient discloses it to a third-party;

   b) the Recipient already rightfully possessed, without obligation of confidentiality, before the Discloser disclosed it to the Recipient;

   c) the Recipient rightfully receives without obligation of confidentiality from any unrelated third-party; or

   d) the Recipient develops independently without reliance upon or use of the Confidential Information.

2. **OBLIGATION OF CONFIDENTIALITY.** The Recipient shall not disclose Confidential Information to any of its officers, directors, employees, contractors or agents or to any third-party without the Discloser's written consent, except that the Recipient may disclose such information to its officers, directors, employees, contractors, and agents

   a) whose duties justify their need to know such Confidential Information;

   b) who have been clearly informed of their obligation to maintain the confidential status of such Confidential Information; and

   c) in the case of those who are not officers, directors or employees of the Recipient, who have signed a non-disclosure agreement containing restrictions, terms and conditions that are at least as restrictive as those set forth herein.

   The foregoing notwithstanding, the Recipient may disclose Confidential Information to the extent required by applicable federal, state or local law, regulation, court order, or other legal process, provided the Recipient has given the Discloser prior written notice of such required disclosure and, to the extent reasonably possible, has given the Discloser an opportunity to contest such required disclosure at the Discloser's expense.

3. **PROTECTION OF CONFIDENTIAL INFORMATION.** The Recipient shall use the same care to prevent disclosure of the Discloser's Confidential Information to the Recipient uses with respect to its own Confidential Information of a similar nature, which shall not in any case be less than the care a reasonable business person would use under similar circumstances.

4. **PERMITTED USE OF CONFIDENTIAL INFORMATION.** The Recipient may only use Confidential Information for the purposes for which it was originally disclosed and only as expressly permitted by the terms and conditions of this Agreement.

5. **RETURN OF CONFIDENTIAL INFORMATION.** Upon the written request of the Discloser, the Recipient shall cease using and promptly return to the Discloser all copies of any Confidential Information then in the Recipient's possession or under the Recipient's control. Upon the written request of the Discloser, the Recipient shall certify in writing that the Recipient has complied with the obligations set forth in this paragraph.

6. **CONFIDENTIALITY PERIOD.** Confidential Information disclosed pursuant to this Agreement shall continue to be subject to the terms of this Agreement for five (5) years (the "Confidentiality Period") following its disclosure to the Recipient.

7. **OWNERSHIP OF CONFIDENTIAL INFORMATION.** Each party shall retain all right, title and interest in and to its own Confidential Information. Neither this Agreement nor any disclosure of Confidential Information shall be deemed to grant the Recipient any license or other intellectual property right.

8. **DISCLAIMERS.** The Discloser provides Confidential Information disclosed hereunder on an "AS IS" basis, without warranties of any kind. Without limiting the foregoing, the Discloser does not represent or warrant that such Confidential Information is accurate, complete or current. The disclosure of Confidential Information containing business plans is for planning purposes only. The Discloser may change or cancel its plans at any time at the Discloser's sole discretion.

9. **INJUNCTIVE RELIEF.** Each party acknowledges that the Confidential Information of the other constitutes the valuable trade secrets of that party and that any use or disclosure by the Recipient of such Confidential Information in a manner not authorized by this Agreement would cause irreparable harm to the Discloser that could not be fully remedied by monetary damages. Each party therefore agrees that the other party may specifically enforce this Agreement and shall be entitled, in addition to any other remedies available to it at law or in equity, to seek injunctive or other equitable relief as may be necessary or appropriate to prevent such unauthorized use or disclosure without the necessity of proving actual or irreparable damage by reason of any such unauthorized use or disclosure.

10. **TERMINATION.** Either party may terminate this Agreement by providing one month's written notice to the other party. Any provisions of this Agreement which by their nature extend beyond its termination, including without limitation, the provisions of Section 6, shall survive and remain in effect with respect to disclosures made before the date of termination and shall apply to both parties' successors and assigns.

11. **GENERAL.** No amendment to this Agreement shall be binding upon the parties unless it is in writing and executed by both parties. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and lawful assigns. The laws of the State of Minnesota shall govern this Agreement. The failure of either party at any time to require performance of any provision of this Agreement or to exercise any right provided for herein shall not be deemed a waiver of such provision or such right. All waivers must be in writing. Unless the written waiver contains an express statement to the contrary, no waiver by either party of any breach of any provision of this Agreement or of any right provided for herein shall be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement. All remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either party at law, in equity or otherwise. This Agreement contains the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all previous communications, negotiations and agreements, whether oral or written, between the parties with respect to such subject matter.

**ABILITY Network Inc.**

By: _____
Its: CFO
Date: 1/10/12

**Dorado Systems, LLC**

By: _____
Its: _____
Date: 1/10/2012

13072820.1

1 of 1

# EXHIBIT B

# Exhibit B

# Omitted Pending Motion to Seal

# EXHIBIT C

# Exhibit C

# Omitted Pending Motion to Seal

# EXHIBIT D

# Exhibit D

# Omitted Pending Motion to Seal

# EXHIBIT E

ABILITY | **COMPLETE**



An Easier Way to
Verify Eligibility

# COMPLETE

**A real-time, patient eligibility and
benefit determination solution
designed to streamline the
admissions process for all types
of Healthcare Providers.**

**COMPLETE** enables fast, automated access to detailed
eligibility and medical benefit information from Medicare,
Medicaid, and over 400 commercial/private payers.

It is also designed to enhance your admissions process by
filtering eligibility benefit information by department or user.
**COMPLETE** streamlines the work involved in eligibility
verification regardless of the job function within your
organization: admitting, billing, or clinical. For example,
situations like HMO enrollments, Dual Eligibility, Medicare as
a Secondary Payer, and many more admissions scenarios
can be automatically brought to the attention of specific
personnel who are able to make the admissions decision.

## Product Features

- Single user interface for eligibility verification to more than 400
  payers; sign in with one login and ID. Information includes
  co-pays, termination dates, deductibles and coinsurance

- Screens with consistent display of response results data by payer
  class (Medicare, Medicaid and Commercial payers)

- Standardized input data fields regardless of payer—makes data
  entry a snap

- Alerts provided when payer's EDI is down, with user prompted
  to call payer and fill in online screen form to capture information
  obtained verbally—no lost time, information is captured and
  recorded when affected payer system is back up

- Quick Batch Entry—allows entry of multiple patients to check
  multiple payers versus checking each individually

- Alerts to indicate when a patient has a coverage overlap—
  includes built in cross reference to all provider NPIs and
  corresponding detail

- Alerts to indicate when a patient has moved from one plan to
  another—includes built in cross reference to proprietary database
  to Medicare HMOs and corresponding detail

- Customizable gap info table by carrier—lets you capture and
  store additional plan data such as phone number and contact
  name. Tool gets smarter as more providers use the system.

- Eligibility inquiries can be customized with multiple EDI service type code to produce a 271 response that is optimized for all types of Healthcare Providers

- Medicare Eligibility access 24/7—easily verify data even after hours and on weekends

- Storage of all validation transactions—provides historical proof of a patient's eligibility status when eligibility is challenged retroactively

Flexible re-validation tool for either individual patient or batch without having to re-key data saving significant time whenever a re-validation is requested

- Consistent, comprehensive understanding of patient eligibility status regardless of payer source
- Significant savings of time, effort, money:
  - Reducing administrative workload because of standardization of input fields streamlining data input and checking multiple payers at once to catch additional coverage
  - Limiting lost work time and revenue even when a payer system is down, there is overlapping coverage, a patient switches coverage, or eligibility status changes during an admission period
  - Limiting lost work time and revenue by building on customizable gap information needed by payer so information is easily accessible, no more recreating or hunting for additional data needed by payer
  - Limiting lost work time with service type code optimized responses
  - Limiting lost work time with no re-keying of data for re-validation

An on-line, web-based insurance validation engine that eliminates the time and workforce issues that providers face when validating and revalidating insurance benefits.

**In order to install ABILITY | COMPLETE you will need:**

- High speed connection to the internet
- Internet Explorer 8, 9, or 10 web browser



Butler Square
100 North 6th St.
Suite 900A
Minneapolis MN, 55403
612.277.3941 |   612.460.4343



Screens with Consistent Display of Response Results Data By Payer Class (Medicare, Medicaid and Commercial payers)

**For more information on** ABILITY | **COMPLETE or to join us for an on-line meeting, contact us:**

**612.460.4327** or **888.895.2649**
**E-mail: info@abilitynetwork.com**

ABILITY Network is a leading healthcare technology company, trusted for over a decade by thousands of hospitals, home health care agencies, hospices, skilled nursing facilities, DME providers and physicians to provide secure and reliable connections to Medicare and other payers and for a broad suite of innovative products and services that help manage the administrative complexities of healthcare. ABILITY is elevating the healthcare conversation, bringing about meaningful change by ultimately improving the patient experience and helping providers focus on what is most important: providing the best possible care to each patient in every community across our country. To learn more please visit                       or follow us on
                                and           .

© 2013 ABILITY Network Inc. All Rights Reserved

# EXHIBIT F

**ABILITY | COMPLETE™**

# All Payer Eligibility Verification and Customizable Dashboard

## Benefits for Your Organization



- **Comprehensive eligibility information**—make eligibility requests to Medicare, Medicaid, and more than 400 commercial payers

- **Greater ease and control for the system administrator**—configure payers, set up users, and determine user permissions

- **Better manage workflow** with the customizable dashboard that prioritizes and assigns patients, payers, and daily task lists – as well as the ability to set up your own reminders and notes to staff at multiple locations

- **Increased staff satisfaction and productivity** from consistent, clear, easy-to-use navigation and screens

- **Eliminate repetitive tasks** with the ability to run multiple payers and patients in one session

- **Increased efficiency when checking eligibility**—verify a patient's eligibility status with multiple payers

- **Significant time savings** using batch imports of eligibility data files

- **Enhanced record-keeping** provides you with access to all eligibility transaction history

ABILITY | COMPLETE puts you in the driver's seat with an all-new workflow dashboard. You can assign and prioritize patients, payers and tasks, plus create free-form and payer-specific notes to more effectively manage multiple tasks. You can also set up and save your own custom filters and sorting options to ensure accounts receive proper follow-up and resolution. **With ABILITY | COMPLETE, your admissions process gets remarkably smoother.** You will have the ability to filter eligibility benefit information by assigned user group or individual user, including alerts if another insurance is detected. Batch features allow you to enter multiple patients and check multiple payers – all in one quick step.




For more information on ABILITY | COMPLETE or to join us for an online demo, contact us:
**888.895.2649 | info@abilitynetwork.com**



# Product Features

**ABILITY | COMPLETE**

- **Simple user-friendly interface** with a single sign-on login and ID. Eligibility verification to over 400 payers with information that includes co-pays, termination dates, deductibles and coinsurance

- **Consistent data displays** of response results by payer class

- **Quick batch entry**—check the eligibility status of multiple patients at a single payer

- **Multiple insurance eligibility verification**—check a patient's eligibility status simultaneously at multiple insurance plans

- **Alerts to indicate other coverage for Medicare patients**—cases of HMO enrollments, dual eligibility, Medicare as a Secondary Payer, and many more admissions scenarios are brought to the attention of designated personnel

- **Ability to filter** Service Type Code (STC) queries and responses and save your favorites, organized by payer

- **All-payer eligibility access 24/7**—easily verify data even after hours and on weekends

- **Storage of all validation transactions** for historical proof of eligibility status when eligibility is challenged retroactively

- **Flexible re-validation option** for either an individual patient or batch without having to re-key demographic data

- **Run recurring batches for your patient census** to regularly monitor insurance coverage

- **Minimal system requirements**—Windows XP SP3 or higher, Internet Explorer 8, 9, or 10 along with a high speed connection to the Internet. For more detailed technical specifications, contact the ABILITY team at **888.895.2649** or **info@abilitynetwork.com**

## The myABILITY™ Platform

ABILITY | COMPLETE includes myABILITY, a SaaS delivery platform that gives you on-demand access to all of your ABILITY services. Whether it's Medicare connectivity, revenue cycle management or eligibility services, ABILITY products can help your financial, patient access, scheduling and administrative areas work more effectively and efficiently.

**Platform features include:**

- Single Sign-On (SSO)
- Site license delivery model (unlimited number of users)
- Customizable user-management allowing different profiles and permission levels to access information

About ABILITY®

ABILITY Network Inc is a leading healthcare technology company trusted for decades by thousands of hospitals, home health care agencies, hospices, skilled nursing facilities, DME and other health care providers throughout the U.S. ABILITY provides a broad suite of innovative workflow tools to help manage the administrative complexities of healthcare. ABILITY is headquartered in Minneapolis, with anchor offices in Boston and Tampa, and satellite offices across the country.



© 2014 ABILITY Network Inc. All Rights Reserved.

# EXHIBIT G

# ABILITY | COMPLETE™

## User Guide